Aryeh Kaufman, Esq. (SBN: 289745)
aryeh@akaufmanlegal.com
**LAW OFFICE OF ARYEH KAUFMAN**
5482 Wilshire Blvd., PMB 1907
Los Angeles, CA 90036
Tel: (323) 943-2566
Fax: (213) 402-8598

*Attorneys for Plaintiff,*
**YOSEF SHLOMO GREENWALD**

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| YOSEF SHLOMO GREENWALD, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BEACH CITIES CHABAD, a non-profit religious corporation,<br><br>Defendant. | Case No. 2:25-cv-5829<br><br>**COMPLAINT FOR:**<br><br>**1. FRAUD IN THE INDUCEMENT;**<br>**2. PROMISSORY FRAUD; AND**<br>**3. DECLARATORY RELIEF** |

**COMPLAINT**

Plaintiff, Yosef Shlomo Greenwald ("Plaintiff"), as and for his Complaint against Defendant Beach Cities Chabad ("Defendant" or "Beach Cities Chabad"), alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff intends to proceed with Beis Din arbitration pursuant to paragraph 8(d) of the Guaranty. A true and correct copy of the Guaranty is attached hereto as Exhibit A.

2. This complaint is currently being filed for the sole purpose of obtaining a prohibitive temporary restraining order and preliminary injunction to maintain the status quo and prohibit Defendant and its agents from recording quitclaim deeds, or to the extent Defendant has already recorded any quitclaim deeds, to prohibit Defendant from further transferring or encumbering, Plaintiff's properties while the case proceeds through the Beis Din arbitration process.

**PARTIES**

3. Plaintiff is an individual who resides in Brooklyn, New York.

4. At all times material hereto, Plaintiff has been a resident of Brooklyn, New York.

5. Defendant Beach Cities Chabad is a nonprofit religious corporation organized under the laws of the State of California, with its principal place of business at 2108 Vail Avenue, Redondo Beach, CA 90278.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that complete diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. This Court has personal jurisdiction over Defendant Beach Cities Chabad in that Beach Cities Chabad is a nonprofit corporation organized under the laws of the State of California and conducts business within the State of California.

8. Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b)(1) and (2), in that Beach Cities Chabad has its principal place of business within this district, and a substantial part of the events giving rise to Plaintiff's claims arose in this district.

## FACTUAL ALLEGATIONS

9. Plaintiff is a dedicated spouse, father of five, and an entrepreneur who started multiple businesses, including, *inter alia*, a business engaged in the buying and selling of high end consumer electronics.

10. Defendant Beach Cities Chabad is a nonprofit religious institution with the stated specific purpose to provide spiritual guidance and instruction to members of the Jewish Faith.

11. Rabbi Joseph Mintz ("Rabbi Mintz") is the CEO of Beach Cities Chabad and the brother-in-law of Plaintiff's older brother.

### A. Plaintiff's Near-Fatal Experience Mid-Flight

12. On or about August 22, 2024, while aboard Turkish Airlines flight TK4 from John F. Kennedy International Airport to Istanbul, Turkey, Plaintiff suffered a sudden and nearly fatal medical emergency mid-flight. This life-threatening event triggered a series of six (6) seizures, one and half collapsed lungs, 92% renal failure (which means his kidneys were at 8% capacity), and led to critical complications including lung and kidney failure, aspiration pneumonia, respiratory failure requiring intubation, neurological impairment and psychiatric symptoms.

13. Shortly after experiencing the nearly fatal medical emergency mid-flight, Plaintiff was taken to a hospital in Istanbul where he was admitted to the ICU and put into a medically induced coma.

14. Plaintiff presented at the hospital in Istanbul with severe shock and multiple organ failures after suffering multiple seizures.

15. Plaintiff remained in the medically induced coma for about eight days, and then stayed in the ICU to recover in Istanbul for an additional five days.

16. The doctors in Istanbul were unable to identify the root cause of the seizures and the brain injury, and they could not do further testing on Plaintiff's brain because his body was too weak from the trauma and from septic shock.

17. On or about September 4, 2024, Plaintiff was taken by a Hatzolah air medevac jet to NYU Hospital to continue his care in the United States.

18. Plaintiff was admitted to the hospital again in September 2024 due to hypoxemic, a condition where there is a low level of oxygen in the blood, specifically in the arterial blood, requiring respiratory support.

19. Between October 2024 and February 2025, Plaintiff suffered from ongoing seizures, multiple hospitalizations, four surgeries, which required Plaintiff to be put under with anesthesia five times, RSV pneumonia, fungal endophthalmitis, resulting in permanent visual damage to his right eye, and persistent neurologic dysfunction.

20. Between October 2024 and February 2025, Plaintiff went to approximately one hundred (100) medical appointments to treat his ongoing seizures, collapsed lungs, hypoxia, brain injury and the resulting trauma, as well as visits to Columbia Presbyterian Hospital to treat the ongoing damage to his right eye from the fungal endophthalmitis.

21. During this time, the doctors at NYU were unable to figure out what was causing Plaintiff's condition because they still could not do an MRI with contrast to properly assess the damage to his brain.

22. It was not until February 2025, after Plaintiff had an additional two seizures that the doctors at NYU took an angiogram and came to the conclusion that Plaintiff had suffered a ruptured AVM (arteriovenous malformation) on August 22, 2024, while traveling to Istanbul.

23. The doctors at NYU immediately decided that to save Plaintiff's life they could not wait any longer and performed an emergency craniotomy and surgical resection of the AVM rupture.

24. However, despite this intervention, Plaintiff continues to suffer from severe cognitive and neurobehavioral impairments, including significant memory deficits, word-finding difficulties, impaired attention and executive functioning, impulsivity, emotional dysregulation, and symptoms consistent with severe anxiety, depression, and Post-Traumatic Stress Disorder (PTSD).

25. A neuropsychological evaluation conducted in April 2025 confirmed measurable deficits in verbal and visual memory, attention span, executive functioning, and language fluency from the August 22, 2024, AVM rupture.

26. On April 17, 2025, Plaintiff filed a federal lawsuit against Turkish Airlines in the Eastern District of New York, Civil Action number 1:25-cv-02046, for multiple causes of action, including negligence based on Turkish Airlines actions in response to Plaintiff's near-death experience on TK4.

27. Plaintiff suffers from a continuing traumatic brain injury that has rendered him unable to work. Plaintiff is currently on disability.

28. To put it bluntly, it is a miracle that Plaintiff is alive today.

**B. The Original Loans**

29. Beginning in or around September 2019, Rabbi Mintz, using Beach Cities Chabad's funds, began extending loans to Plaintiff for the purpose of financing business-related ventures, starting with an initial loan of one million two hundred thousand dollars ($1,200,000.00). Between September 2019 and November 2023, Rabbi Mintz continued to extend additional funds to Plaintiff, ultimately providing approximately fifteen million nine hundred and fifty thousand dollars ($15,950,000.00) in total loaned funds (the "Original Loans").

30. Throughout the course of the parties' lending relationship, Plaintiff made substantial interest payments while repaying the loans, totaling approximately four million dollars ($4,000,000.00), and did so in accordance with the terms agreed upon by the parties.

31. At no point during this longstanding and successful arrangement did Rabbi Mintz or Defendant request or require Plaintiff to sign documents pledging real estate or other assets as collateral. In fact, Defendant extended over ten million dollars in loans before Plaintiff made any repayments against the principal.

32. Prior to June 2024, Plaintiff paid off $10,150,000 of the Original Loan amount, in addition to paying approximately $4,000,000 in interest.

33. As of June 2024, Plaintiff owed Beach Cities Chabad approximately $5,800,000.

**C. <u>The November 2024 Loan</u>**

34. In or around October 2024, Plaintiff, reeling from the effects of an undiagnosed AVM rupture that left him medically, cognitively, and emotionally impaired, approached Rabbi Mintz, his friend and extended family member who had already loaned large sums of money, to obtain further funds to salvage what remained of his businesses, legacy, and livelihood. Plaintiff had already suffered enormous financial and reputational damage due to his medical crisis and urgently sought funding to stabilize his affairs and pay off critical obligations.

35. Rabbi Mintz promised Plaintiff that he would loan Plaintiff a total of $7,000,000 on top of the unsecured $5,800,000 balance of the Original Loans that Rabbi Mintz, using Beach Cities Chabad funds, had already loaned to Plaintiff.

36. Instead of the promised $7,000,000, Rabbi Mintz used his influence and the trust Plaintiff had in him as a friend and extended family member, to fraudulently induce Plaintiff into entering into a one million dollar ($1,000,000.00) loan agreement (the "New Loan"), which only had an additional $2,000,000 of potential future loans (the "Future Loan Amount") that were at Rabbi Mintz and Beach Cities Chabad's sole and absolute discretion.

37. Beach Cities Chabad did not extend any of the Future Loan Amount to Plaintiff.

38. Unlike all the prior loans from Rabbi Mintz and Beach Cities Chabad, which had required no collateral, executed quitclaim deeds, or an option to purchase all of Plaintiff's properties, Rabbi Mintz now insisted, for the first time, that the board required significant collateral, including the execution of quitclaim deeds to his properties and ownership interests in multiple limited liability companies.

39. Specifically, Defendant required personal guarantees from Plaintiff and his wife, as well as certain limited liability companies, as set forth in the Guaranty attached hereto as Exhibit A.

40. Additionally, Rabbi Minz included the balance of the Original Loan amount ($5,800,000) in the New Loan, which had previously been unsecured.

41. However, while Rabbi Mintz was stating that Beach Cities Chabad's board was requiring significant collateral and quitclaim deeds, and prior to the execution of the New Loan, Rabbi Mintz repeatedly assured Plaintiff that the security instruments, including the deeds under the Guaranty, would never be recorded or enforced. In a written text message sent by Rabbi Mintz to Plaintiff on or about October 10, 2024, Rabbi Mintz stated in reference to the properties, "Please know I will never ever foreclose. It's just to keep [the board of Beach Cities Chabad] happy to get them off my back. That's my guarantee to you. You don't have to worry about it."

42. Plaintiff ended up executing a promissory note (the "Note"), a pledge and security agreement, a guaranty (the "Guaranty"), and associated quitclaim deeds and memorandums of option to purchase on each property listed in the Guaranty (all of the foregoing are scollectively referred to herein as the "New Loan Documents").

43. The New Loan Documents were executed on or about November 1, 2024, however, Plaintiff did not receive the funds for over a month, until approximately December 2024.

44. The obvious purpose of the Guaranty, however, was to obtain title to Plaintiff's valuable real property through fraudulent and unconscionable means.

45. The Guaranty states in Section 2, that Plaintiff, as guarantor, "grants to Lender [Defendant] an exclusive and irrevocable option ('Option') to purchase the real property located at the addresses set forth on the signature page attached hereto (individually and collectively, the 'Property') on the terms and under the conditions set forth herein."

46. The Property includes eleven (11) properties in Delaware, New York, and Connecticut, including Plaintiff's two personal family residences (one in Brooklyn and one in Pomona, NY).

47. The aggregate market value of the pledged real properties is approximately forty-five million dollars ($45,000,000.00).

48. At the time the New Loan was executed, Plaintiff conservatively held twenty-three million dollars ($23,000,000.00) in equity in those properties, which is now closer to thirty million dollars ($30,000,000) because of the approved plans for the Community Development (described below in ¶¶ 69-71).

49. There is no purchase price given for the "Option" in the Guaranty. Nor are there purchase prices in the "Memorandum of Purchase Option and Restrictive Declaration" for each property under Section 2(g).

50. Under Section 2, subdivision (b), the "Option Term" is from November 1, 2024, until the Note is paid in full.

51. However, under Section 4 of the Guaranty, the Lender retains broad discretion as to whether or how any proceeds from the properties are applied toward repayment of the Note.

52. Indeed, under Section 4, subdivision (b), even "[i]f the indebtedness guaranteed hereby is partially paid for any reason, this Guaranty shall nevertheless remain in full force and effect, and the undersigned shall remain liable for the entire unpaid balance of the indebtedness guaranteed hereby."

53. Moreover, under Section 2, subdivision (c), "Prior to the closing of the Loan and execution of this Guaranty, Guarantor has delivered to [Defendant's counsel] DJK Counsel, Ltd., as escrow holder, a deed in recordable form conveying Guarantor's respective fee title in and to the Property to Lender (each a 'Deed' and, collectively, the 'Deeds')"

54. Under Section 2, subdivision (d), a "Purchase Option Trigger" occurs upon default, at which point, under 2(e)(i), Lender may "exercise the Option" at any time.

55. However, under 2(e)(ii) of the Guaranty, "[i]mmediately following the Option Exercise Notice, DJK Counsel, Ltd. is hereby automatically, promptly, and irrevocably authorized to record any and all of the Deeds."

56. Under 2(e)(iii), "[i]mmediately following the Option Exercise Notice, Guarantor shall deliver to DJK Counsel, Ltd. all other documents and instruments as may be reasonably required by the parties to complete the transfer of the Property[.]"

57. Furthermore, Rabbi Mintz promised Plaintiff that Beach Cities Chabad would release its UCC liens on properties if Plaintiff needed to refinance a property to pay down the loan amount. In a message dated October 29, 2024, Plaintiff stated to Rabbi Mintz, "I'm also afraid that when we need to release some stuff bc of refis or other things he [referring to Beach Cities Chabad's attorney, Daniel Katz] will make this so complicated." In response to this message, Rabbi Mintz stated, "He [again referring to Beach Cities Chabad's attorney, Daniel Katz] will never make it complicated because he will not be involved anymore. I am not working with him anymore after this. That's the last thing I need. *I just need to get this done and after will start releasing*. Please help me here. I need to get this done so he's off my back." (Emphasis added.)

58. In a later text message the same day, Rabbi Mintz states, "Please let's finalise this. It will give me freedom more than you you know."

59. In a further text message the same day, Rabbi Mintz states, "If you could do it, let's do it. I told you just finish what he wants and we will change it. He told me himself. Everything could be changed and he doesn't care once he signed off on it but I gotta get through this otherwise I don't want to drag this it's costing me too much money, I'm asking for money but it's already 20 grand."

60. The following day, October 30, 2024, Plaintiff stated to Rabbi Mintz, "Please let's try. He asked for my social and few small things. The board is very very secured. When the bank gave me aa 15m line they didn't get this :)". In response to this text message, Rabbi Mintz stated, "I don't wanna be difficult it's not me. Let's get through this and then we will change everything after a month. That's all I'm asking. If not there's nothing I could do."

61. In a further message, Rabbi Mintz stated, "Help me out of here get the documents I will not do anything to hurt you never did never will so they could approve it and they back off and then I have free rain to do as I please; *Then we can get back to normal like before*; He told me Katz in an email. I got a few hours ago that they're waiting for you and your lawyers so please let's just get this done and we're good and then I don't even mind amending it afterwards…" (Emphasis added.)

62. Based on these representations, Plaintiff signed the New Loan Documents with the understanding that the quitclaim deeds and Guaranty were merely for appearance and would not be used against him under any circumstances, and that things would be the same as with the Original Loans. Had Plaintiff not received these false representations from Rabbi Mintz, he never would have signed quitclaim deeds giving fee title to his valuable properties, including his family homes, to Defendant, which Defendant could record upon an alleged breach.

**D. <u>Plaintiff Attempts to Refinance a Property to Pay the Note</u>**

63. In June 2025, when the first payment of $75,000 was due, Plaintiff attempted to refinance one of the properties to pay the first principal installment against the New Loan.

64. Plaintiff lined up a loan from a reputable bank against one of the 11 properties, but could not finalize the loan because Defendant refused to release its recorded lien and its recorded "Memorandum of Purchase Option and Restrictive Declaration" despite Rabbi Mintz's documented promises to the contrary.

65. Without the ability to access the equity in his properties, Plaintiff was left with no way to pay the installment payment on the New Loan.

66. Despite promises from Rabbi Mintz that Beach Cities Chabad would never foreclose on Plaintiffs, on June 6, 2025, Plaintiff received a Notice of Default and Acceleration (the "Notice") from Beach Cities Chabad's counsel Daniel Katz, who is also the escrow agent holding the deeds in trust, demanding immediate payment and stating that, due to Plaintiff's failure to make the scheduled payment of seventy five thousand dollars ($75,000.00) due on June 1, 2025, a default had occurred under the New Loan Documents.

67. The Notice further stated that as a result of the default, the loan was accelerated and a "Purchase Option Trigger" had occurred, and further that Beach Cities Chabad may exercise all rights and remedies available under the Loan documents, including its option to purchase the real property described in the Guaranty. A true and correct copy of the June 6, 2025, letter is attached hereto as Exhibit B.

68. Plaintiff reasonably relied on Defendant's representations in executing the New Loan Documents. Plaintiff would not have entered into these agreements but for Rabbi Mintz's specific and repeated promises, and his diminished emotional and physical state as a result of his ongoing brain injury.

69. One of the properties included in the Guaranty is the site of an ongoing community development project (the "Community Development") in which

Plaintiff has already invested more than seven million dollars ($7,000,000.00) and recently obtained permits to start construction, which he cannot do because of the liens on that property, which is located on Eastern Parkway in Brooklyn.

70. The Community Development is a unique development opportunity. Nothing like it exists anywhere close to it. The approved plans call for two main event halls, a luxury spa facility, 80 hospitality rooms, nine floors above ground and three below ground, and an on-site synagogue that will have weekly community classes.

71. If Defendant records the deeds or asserts ownership over the Community Development or any of Plaintiff's other properties, Plaintiff will lose not only his substantial investment and profits he stands to gain from the Community Development, but also face potential breach of multiple other agreements related to those properties, exposing him to further financial liabilities and reputational harm. This cannot be overstated: the consequences of such actions would be catastrophic for Mr. Greenwald.

72. The ongoing threat that Defendant will record the deeds, thereby transferring title to Plaintiff's properties without judicial oversight, has caused severe distress to Plaintiff.

73. Plaintiff has also been damaged by his inability to refinance or access equity from the encumbered properties to pay other creditors. These injuries flow directly from Defendant's misrepresentations before the execution of the New Loan Documents.

74. The risk of Defendant's recording of deeds to the properties set forth in the Guaranty has prevented Plaintiff from refinancing or accessing equity, jeopardized an active multi-million dollar development project, and exposed him to additional contractual and financial liabilities. These consequences—compounded by his already fragile medical and emotional condition—underscore

the profound and lasting damage caused by Defendant's exploitation of Plaintiff's vulnerability, and reveal the unconscionability of the Guaranty.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Inducement**

**(Plaintiff Against Defendant)**

75. Plaintiff realleges and incorporates by reference Paragraphs 1 through 74 as though fully set forth herein.

76. Defendant, through its agent, Rabbi Mintz, intentionally misrepresented the nature and effect of the New Loan Documents presented to Plaintiff in or around October and November 2024.

77. At the time Plaintiff signed the New Loan Documents, he was in a severely impaired cognitive and emotional state resulting from his recent neurological emergency, multiple hospitalizations, surgery, and ongoing neurobehavioral deficits.

78. Rabbi Mintz took advantage of Plaintiff's impaired condition by presenting the Guaranty as a formality, falsely representing that the deeds would never be recorded and were needed solely for internal or cosmetic purposes to satisfy board requirements and that he would never foreclose on Plaintiff.

79. Rabbi Mintz also promised to release the properties to allow Plaintiff to use it to pay installments of the New Loan, but when the first payment was due in June, Rabbi Mintz and Beach Cities Chabad refused to release the property thereby causing Plaintiff to go into default on the New Loan.

80. Rabbi Mintz's representations were false. Rabbi Mintz knew that the representations were false when he made them, or he made the representations recklessly and without regard for their truth.

81. Rabbi Mintz intended Plaintiff to rely on the representations, and Plaintiff justifiably relied on Rabbi Mintz's representations and executed the documents.

82. As a direct and proximate result of Defendant' conduct, Plaintiff has suffered substantial harm, including the loss of control over valuable real estate assets, the risk of involuntary transfer of property titles, severe reputational damage, emotional and psychological distress.

83. Plaintiff's reliance on Rabbi Mintz's misrepresentations was a substantial factor in causing Plaintiff's harm.

84. Plaintiff is entitled to rescission, compensatory damages, punitive damages under Civil Code section 3294, and any other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF

**Promissory Fraud**

**(Plaintiff Against Defendant)**

85. Plaintiff realleges and incorporates by reference Paragraphs 1 through 74 as though fully set forth herein.

86. Prior to the execution of the New Loan, Rabbi Mintz, acting on behalf of Beach Cities Chabad, made repeated and specific promises to Plaintiff that the Guaranty would never be enforced, recorded, or used to initiate foreclosure proceedings as to the real properties set for the in the Guaranty.

87. Rabbi Mintz further promised that the documents were needed only for internal purposes and to "keep the board happy," and assured Plaintiff that "foreclosure would never happen" and that Plaintiff "did not have to worry about it." Rabbi Mintz also promised to release liens so that Plaintiff could refinance properties to pay back the New Loan.

88. These promises were false when made or they were made with reckless disregard for their truth. At the time the promises were made, Rabbi Mintz did not intend to honor them and instead intended to use the signed documents to obtain leverage over Plaintiff and to record quitclaim deeds to Plaintiff's real estate.

89. Plaintiff reasonably and justifiably relied on these false promises when he executed the New Loan Documents.

90. The false promises made by Rabbi Mintz substantially influenced Plaintiff's decision to enter into the New Loan Documents. Plaintiff would not have signed the New Loan Documents, including without limitation the Guaranty, but for those promises.

91. As a result of Plaintiff's reliance, he has suffered substantial harm, including the encumbrance of over twenty million dollars in real estate, the risk of involuntary loss of those assets due to Defendant's ability to transfer title under the executed deeds.

92. Plaintiff is entitled to rescission, compensatory damages, punitive damages under Civil Code section 3294, and any other relief the Court deems just and proper.

## **THIRD CLAIM FOR RELIEF**

### **Declaratory Relief**

### **(Plaintiff Against Defendant)**

93. Plaintiff realleges and incorporates by reference Paragraphs 1 through 74 as though fully set forth herein.

94. An actual controversy exists with respect to the enforceability of the option to purchase Plaintiff's properties in the Guaranty. On June 6, 2025, Defendant sent Plaintiff a Notice of Default and Acceleration from Defendant's counsel, whose law practice is also the escrow agent holding the quitclaim deeds in trust, stating that a default had occurred under the New Loan Documents. The notice further stated that as a result of the default, a Purchase Option Trigger had occurred and that Beach Cities Chabad may exercise all rights and remedies available under the New Loan Documents, including its option to purchase the real property described in the Guaranty.

95. The "Option" in the Guaranty does not contain a purchase price for the real estate, and therefore violates the Statute of Frauds.

96. The Guaranty, and specifically its provision for recordation of deeds for fee title to Plaintiff's real property, are unenforceable as unconscionable. See Cal. Civ. Code, § 1670.5.

97. Under California law the doctrine of unconscionability reaches contract terms relating to the price of goods or services exchanged, and the price charged for lending a particular amount of money to a given individual or entity may be deemed unconscionable. See *De La Torre v. CashCall, Inc.*, 5 Cal.5th 966, 975-976 (Cal. 2018).

98. The face of the Guaranty, but also the setting, purpose, and effect reveal its gross unfairness, such that, under the relevant circumstances, the Court should prohibit Beach Cities Chabad from recording the quitclaim deeds to Plaintiff's real estate.

99. Plaintiff was fraudulently induced into executing the Guaranty, as Defendant promised that the deeds would not be recorded. Defendant's misrepresentations, coupled with Plaintiff's ongoing brain injury, effectively robbed Plaintiff of meaningful choice.

100. Plaintiff and Defendant did not have equal bargaining power. Plaintiff was impaired due to ongoing brain injury and desperate for funds to sustain his business operations. Defendant, through Rabbi Mintz, exploited its position of trust.

101. The Guaranty provides for an illusory "Purchase Option" to disguise the true effect of the deed transfer. Under the Guaranty, Defendant's counsel holds deeds for fee title in escrow, which may be recorded upon default, thereby obviating any need to "purchase" the properties. The terms are deceptive, resulting in surprise.

102. The substantive contract terms are overly harsh and oppressive. The fair market value of the properties set forth in the Guaranty vastly and unreasonably exceeds the amount of the Note ($6,800,000), and there is no requirement in the

Guaranty that Defendant apply proceeds from the properties to satisfy Plaintiff's obligations under the Note.

103. Additionally, among the properties set forth in the Guaranty are Plaintiff's family residences. There is absolutely no justification for Plaintiff's personal residences to be included.

104. The Guaranty has allowed Defendant to record UCC liens for the properties, which prevent Plaintiff from repaying the Note thereby obstructing Plaintiff's performance.

105. Declaratory relief will settle the parties' controversy related to the rights and obligations under the Guaranty, and will serve a useful purpose in clarifying the parties' legal relations.

106. Plaintiffs therefore seek declaratory and further relief under 28 U.S.C. §§ 2201 *et seq*. (the Declaratory Judgment Act).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Yosef Shlomo Greenwald, respectfully requests that this Court grant the following relief:

1. For a Temporary Restraining Order and Preliminary Injunction, barring Defendant and/or any parties acting on its behalf, from recording, enforcing, or otherwise acting upon any quitclaim deeds, collateral assignments, or security instruments executed by Plaintiff in connection with the November 2024 Promissory Note, Pledge and Security Agreement, and Guaranty, as to all properties in which Plaintiff holds an interest;
2. To compel arbitration of this matter pursuant to the arbitration clause set forth in Paragraph 8(d) of the Guaranty, before a Beis Din.

In the alternative, should this matter proceed before the Court rather than through Beis Din arbitration, Plaintiff respectfully requests that the Court:

1. Enter judgment in favor of Plaintiff and against Defendant;

2. That the Court declare the New Loan Documents, including the Guaranty and the option to purchase therein, unenforceable due to fraud in the inducement;
3. That the Court declare the Guaranty and any deeds of trust or collateral assignments thereunder, are unenforceable due to unconscionability;
4. That the Court order rescission of the Promissory Note, the Pledge and Security Agreement, the Guaranty, and all related security instruments, and direct that all recorded instruments be cancelled;
5. That the Court award Plaintiff compensatory damages in an amount to be determined at trial;
6. That the Court award punitive damages due to Defendant's fraudulent, oppressive, and malicious conduct;
7. That the Court award pre-judgment and post-judgment interest as permitted by law;
8. That the Court award Plaintiff reasonable attorneys' fees and costs incurred herein; and
9. That Plaintiff be awarded such other and further relief as this Court deems just and proper.

Dated: June 26, 2025

**LAW OFFICE OF ARYEH KAUFMAN**

By: *<u>/s/ Aryeh Kaufman</u>*

Aryeh L. Kaufman, Esq.,
*Attorneys for Plaintiff,*
**YOSEF SHLOMO GREENWALD**

**REQUEST FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Yosef Shlomo Greenwald hereby requests that if this case proceeds in this Court as opposed to in Beis Din arbitration, that the trial proceeds by jury on all claims so triable.

Dated: June 26, 2025

**LAW OFFICE OF ARYEH KAUFMAN**

By: */s/ Aryeh Kaufman*
Aryeh L. Kaufman, Esq.
*Attorneys for Plaintiff,*
**YOSEF SHLOMO GREENWALD**